Nathan R. Sobel, S.
At issue in this proceeding is the right of an illegitimate child to inherit from his putative father.
The father’s will has been offered for probate. It makes no disposition or even mention of the illegitimate child. Apart from a disposition to a charitable foundation, the entire residue is divided equally between testator’s two legitimate children.
Issue is joined by the motion of the preliminary executors to strike a notice of appearance filed by the illegitimate in the probate proceeding.
For the purpose of this motion and based on the underlying support, it will be assumed by the court that the testator is indeed the father of the illegitimate, the latter having been born to him and the natural mother in a Brooklyn hospital on November 23, 1934. It is however also established by the proof that the father and mother of the illegitimate were never married: also that no order of filiation was ever made during the lifetime of the father in the courts of this or any other jurisdiction.
This is therefore a post-mortem (i.e. after the death of the father) effort by the illegitimate son to establish paternity and his status as a distributee of his father. For, unless he is a *857 distributee he does not benefit if the will is denied probate; he is not a person whose interests are "adversely affected” by probate of the will (SCPA 1410) and he has no standing to contest probate.
This court grants the motion to strike the appearance of the illegitimate in the pending proceedings. It is determined that he is not a distributee. Our statutes do not give to an illegitimate an unconditional right to inherit from his putative father. In order to inherit, our statutes require as an absolute condition that an order of filiation shall have been entered during the lifetime of the father in a court of competent jurisdiction of this or another State. New York, unlike several other States, has refused to permit any post-mortem determination of paternity, however strong the proof.
Law review articles and court decisions, when injustice is apparent, have deplored the disabilities which affect illegitimates in this and other areas of law. These have on occasion stirred legislative action — only occasionally successful but most often not. It may be helpful to discuss in particular the problem of intestate inheritance by illegitimates from the experience of this the busiest court in the State measured by the number of intestate estates which traffic daily through this court.
It is appropriate first to observe that most of the legal disabilities, other than intestate succession, which affect illegitimates have been removed to a. substantial extent by recent decision of the United States Supreme Court and of our own courts. (Levy v Louisiana, 391 US 68 [right to share in wrongful death recoveries]; Glona v American Guar. Co., 391 US 73 [ditto, wrongful death recoveries]; Willis v Prudential Ins. Co., 405 US 318 [right to share in insurance policies]; Stanley v Illinois, 405 US 645 [putative father’s right to notice and custody]; Weber v Aetna Cas. & Sur. Co., 406 US 164 [right to share in workmen’s compensation awards]; Gomez v Perez, 409 US 535 [right to compel support from putative father]; Richardson v Davis, 409 US 1069 [right to social security benefits]; New Jersey Welfare Rights Org. v Cahill, 411 US 619 [right to share in wholly State-supported welfare program]; Jiminez v Weinberger, 417 US 628 [right to share in social security disability benefits]; Holden v Alexander, 39 AD2d 476 and many cases cited [wrongful death benefits].)
No empirical study has been or probably could be made of the1 number of illegitimates deprived by law of the right to *858 intestate succession. But judging by the infrequency of "claims” (such as in the instant case) it is possible to conclude that distribution of wrongful death proceeds, workmen’s compensation and social security benefits far exceed in economic value to illegitimates, the economic benefits which might flow from the right to intestate succession. The estates in which "claims” are filed are invariably small — most often administered by the public administrator — and the share of the illegitimate smaller.
In Labine v Vincent (401 US 532) the Supreme Court held that the choices reflected by the intestate succession statutes of a State, are within the power of the Legislature of each State to make. Therefore State statutes which deny to illegitimate children the same right to inherit as are allowed legitimate children, do not violate the Equal Protection Clause of the Fourteenth Amendment. Thus Labine effectively forecloses any inquiry by courts as to the constitutionality of its State’s succession statutes governing the rights of illegitimates. It leaves the Legislature of each State free to impose statutory restrictions, strict or liberal (or indeed none at all as in Arizona and Oregon), on the rights of illegitimates to inherit.
New York has made such a choice. It was made by the Legislature on study and recommendation of the Bennett Commission on Estates (Fourth Report, Temporary State Comm. on Modernization, Rev. and Simplification of Laws of Estates, NY Legis Doc, 1965, No. 19, pp 233-271). The existing statute EPTL 4-1.2 effective September 1, 1966 is the result. (See L 1965, ch 958, enacting Decedent Estate Law, § 83-a, eff March 1, 1966.)
The statute was the result of a studied and deliberate decision by the members of the Bennett Commission, all experienced Surrogates or estate practitioners. Its report emphasized two major concerns, one practical and the other procedural.
As a practical matter permitting an illegitimate child unconditionally to inherit from a parent can cut down the distributive share of a lawful surviving spouse having no ties to the illegitimate child. It will in every case reduce the distributive share of legitimate children, if any. It will totally defeat the succession rights of parents and siblings of the intestate. Concerned and willing to extend the rights of illégit *859 imates to inherit, these practical problems judging from the debates disturbed the commission members very little.
The procedural problems, however, were of real concern to the experienced members of the commission. An illegitimate, if made an unconditional distributee in intestacy, must be served with process in the estate of his parent or if he is a distributee in the estate of the kindred of a parent. (SCPA 1003.) And, in probating the will of his parent (though not named a beneficiary) or in probating the will of any person who makes a class disposition to “issue” of such parent, the illegitimate must be served with process. (SCPA 1403.) How does one cite and serve an illegitimate of whose existence neither family nor personal representative may be aware? And of greatest concern, how achieve finality of decree in any estate when there always exists the possibility however remote of a secret illegitimate lurking in the buried past of a parent or an ancestor of a class of beneficiaries? Finality in decree is essential in the Surrogates’ Courts since title to real property passes under such decree. Our procedural statutes and the Due Process Clause mandate notice and opportunity to be heard to all necessary parties. Given the right to intestate succession, all illegitimates must be served with process. This would be no real problem with respect to those few estates where there are “known” illegitimates. But it presents an almost insuperable burden as regards “unknown” illegitimates. The point made in the commission discussions was that instead of affecting only a few estates, procedural problems would be created for many — some members suggested a majority — of estates.
I

The Right of the Illegitimate Child to Inherit From His Mother

The statute ultimately enacted upon the recommendation of the Bennett Commission gave to the illegitimate child an absolute right to inherit from his mother and her kindred and they from him. In a sense our statutes governing the descent and distribution of property in intestacy (EPTL 4-1.1) are “statutory wills”, the property passing according to the presumed intent of the intestate. With respect to the practical concerns, the commission based its recommendation on the rational presumption that an illegitimate child usually stands *860 as close in the affection and concern of the mother as do her legitimate children.
As concerned the procedural problems discussed, the birth to the mother is a recorded and registered event usually taking place in the presence of others. In most cases the child will remain with and be reared by the mother. That the illegitimate is the child of the mother is never difficult of proof. Upon the mother’s death, her family and the personal representative of her estate will be aware of the existence of the illegitimate child as a necessary party in any estate proceeding. What has been said of the relationship of mother with the illegitimate child is equally true of the mother’s kindred.
Rationally and reasonably with respect to the mother-child relationship, the statute enacted provided—
"EPTL 4-1.2 * * *
"(a) For the purposes of this article:
"(1) An illegitimate child is the legitimate child of his mother so that he and his issue inherit from his mother and from his maternal kindred * * *
"(b) If an illegitimate child dies, his * * * mother [and] maternal kindred * * * inherit * * * as if the decedent were legitimate” (see Decedent Estate Law, § 83-a as enacted by L 1965 ch 958, eff March 1, 1966; see also L 1966 ch 952; L 1967 ch 686).
In consequence of the new statute, since March 1, 1966, an illegitimate child in relation to his mother stands in the identical shoes of the legitimate child. He inherits from his mother and his mother’s kindred and they from him. Prior to March 1, 1966 the illegitimate could inherit from the estate of his mother only when there were no lawful issue; such right to inherit from the mother did not extend to the mother’s kindred. The new statute was a rational reversal of prior policy.
II

The Right of the Illegitimate Child to Inherit From His Putative Father

As concerns the practical considerations, neither the commission nor the Legislature could rationally presume (as in the case of the mother-child relationship) that any substantial *861 number of putative fathers desired that their illegitimate children should inherit from them to the same extent as legitimate children. It would be irrational on the basis of experience to so presume. The putative father may never even have been aware of the birth of the child. Even if aware, he may be totally unconcerned because of the absence of any ties of affection with the mother or familial relationship with the child. Often his first awareness is as an unwilling protagonist in a paternity proceeding.
At the time of the study of the Bennett Commission, all experience within the courts had been with "bastardy”, now termed "paternity” proceedings. (For history of such proceedings, see Commissioner of Public Welfare v Koehler, 284 NY 260.) Presently, exclusive original jurisdiction over such proceedings is in the Family Courts. (Family Court Act, art 5.) Such a proceeding could be commenced by the mother (or by the Department of Social Services) to establish paternity as a condition precedent to compelling support. (Family Court Act, § 511). After trial, upon sufficient proof, an "order of filiation” declaring paternity could be made by the court. (Family Court Act, § 542.) Most frequently, the putative father, before trial, could admit paternity and consent to an order of support, or consent to an order of support without admitting paternity. (Family Court Act, § 516.) The point made is that the docketing of an "order of filiation” establishing paternity entitled the child to support but at the time of the Bennett Commission’s study did not entitle the child to inherit from the putative father.
The members of the Bennett Commission whose prime objective was to liberalize as fully as practical the rights of illegitimates to inherit from their putative fathers were willing to disregard the practical concerns heretofore discussed. Insofar as the procedural problems were concerned, an "order of filiation” was a recorded event duly entered in a judicial proceeding. The record was available to all personal representatives of a deceased putative father in any proceeding commenced in the Surrogates’ Courts.
The statute recommended by the commission and duly enacted, as concerns the right of an illegitimate to inherit from a putative father, provided:
"EPTL 4-1.2 * * *
"(a) For the purposes of this article: * * *
"(2) An illegitimate child is the legitimate child of his father *862 so that he and his issue inherit from his father if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child.
"(3) The existence of an agreement obligating the father to support the illegitimate child does not qualify such child or his issue to inherit from the father in the absence of an order of filiation made as prescribed by subparagraph (2). * * *
"(b) If an illegitimate child dies his * * * father inheritfs] * * * as if the decedent were legitimate, provided that the father may inherit * * * only if an order of filiation has been made in accordance with the provisions of subparagraph (2)” (see Decedent Estate Law, § 83-a added L 1965 ch 958 eff March 1, 1966; see also L 1966, ch 952; L 1967 ch 686).
The quoted statute represents a considerable advance over past policy since prior thereto the illegitimate had no right whatsoever to inherit from his putative father. The right of inheritance under the statute did not however, extend from or to the father’s kindred because, unlike the mother-child relationship, it could not be presumed that the father’s kindred would have knowledge of the birth of the illegitimate and the opportunity if they so desired to exclude the child by testamentary provision.
Some other things about the statute should be noted.
(1) The requirement of an order of filiation declaring paternity is absolute. An order of a competent court directing support without an order of filiation will not suffice.
(2) Also absolute is the requirement that the order of filiation be made in a proceeding commenced during the lifetime of the father and within two years of the birth of the child. In that regard, it is observed that under section 517 of the Family Court Act an exception to the two-year limitation is made where "paternity has been acknowledged by the father in writing or by furnishing support.” Also under the same section a public welfare official may institute proceedings "not more than ten years after the birth of the child.” These exceptions may suffice to permit establishing paternity for the purpose of support. It will not suffice to establish paternity for the purpose of intestate inheritance. For that purpose the two-year period of limitation is absolute.
However the Statute of Limitations is a "defense”, in a *863 proceeding to establish paternity which may be availed of by the putative father. However this court has held that a putative father desiring to acknowledge his illegitimate child, may voluntarily at any time during his lifetime himself petition the Family Court for an order of filiation. (Matter of Bell, NYLJ, Nov. 10, 1969, p 17 col 1; cf Matter of Crane v Battle, 62 Misc 2d 137.)
Also in regard to the two-year limitation, this court in Matter of Ortiz (60 Misc 2d 756, 758) observed — "because of the short period of time within which to commence a filiation proceeding, no initiative of the child — since he cannot act for himself — can achieve for him legitimate status. Such a provision creates constitutional questions.” The quoted comment was given consideration by the Surrogates Association. It was concluded (as did the Bennett Commission) that neither a five- or ten-year statute would permit the child to commence a proceeding "on its own initiative.” And, that a longer period than two years would make it difficult and even impossible for the putative father to defend against a charge of paternity. The Colorado Supreme Court has since the quoted comment in Ortiz sustained such a five-year statute as constitutional from a due process and equal protection attack. (In Matter of People ex rel. L.B. v L. V.B. 179 Col 11, app dsmd 410 US 976 [no Federal question].) Essentially the court determined that the Legislature may balance the right of one person to enforce a claim and another person to defend before the lapse of time makes his proof difficult to obtain or present. Any balance of these interests which has a rational purpose is within the discretion of the Legislature and not subject to either due process or equal protection attack.
(3) The quoted statute by requiring as an absolute, a judicial "order of filiation” permits the illegitimate to inherit from his "unwilling” father. Paternity proceedings are invariably instituted only when the putative father is unwilling to recognize or support the child.
There are however many "willing” fathers who have recognized their illegitimate children and supported the children without any necessity for compulsory judicial proceedings and judicial orders. Some have acknowledged the child by public holding out, others by extra judicial acknowledgements in writing, others by voluntarily supporting the child. Indeed some have raised the child in a familial (but unwedded) setting, supporting both mother and child.
*864 It seems therefore anomalous that the statute permits inheritance from the "unwilling” father but not from the "willing” father. Many States recognize such public holding out, acknowledgements in writing and furnishing of support as proof of paternity entitling the illegitimate to inherit. To recognize such proof however, invites post-mortem litigation, i.e. assertions of paternity after the putative father is dead and when he is not available to counter such proof. The commission did give serious consideration to the acceptance of proof other than a judicial order of filiation to establish paternity. (Fourth Report, NY Legis Doc, 1965, No 19, pp 260-262.) It expressed its ultimate determination in its report as follows (pp 266-267): "The utmost caution should be exercised to protect innocent men from unjust accusation in paternity claims. To avoid such hazard no informal method of acknowledgement has been provided for in the recommendations * * * The procedure in other states provided merely that any informal witnessed writing establishing the relationship of father and child between the deceased and the claimant is sufficient to establish paternity, allows paternity to be established after the death of the father, thus affording considerable opportunity for falsification of evidence and inviting harassing litigation.”
The commission balanced the procedural problems heretofore discussed and the disenchanting spectre of post-mortem strike suits against the occasional injustice resulting to illegitimates. Based on their experience, the members concluded that the truly willing father has available (and has availed himself of) many methods of providing for his illegitimate child. He can (and most often does) make a will with provision for the child. He can marry the mother and such a marriage whether voidable or void and bigamous, suffices to legitimate the child. (Domestic Relations Law, § 24; see also Matter of Ortiz, supra, 60 Misc 2d 756, 758-759.) If he does not wish to marry the mother, he can adopt the child — or, if that procedure is too expensive, he can execute in the Family Court a voluntary petition consenting to an order of filiation. If the willing putative father does not avail himself of any of these methods of providing for his child, it may be presumed that he does not wish the child to inherit from him. Indeed many fathers, for perfectly valid reasons, make no provision in their wills for their legitimate children.
In the instant case, it is conceded that the parents of the *865 illegitimate had never married; that the father had made no provision in the will for him; that he had not been adopted by his putative father and that no order of filiation had ever been made in any court of competent jurisdiction within or without the State.
The appearance in the probate proceeding of the illegitimate is stricken. Since he is not a distributee in intestacy, he has no standing as a party "adversely affected” (SCPA 1410) to contest probate or the jurisdiction of this court.